**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. **19-20583**CR-WILLIAMS/TORRE

FILED BY _____ D.C.

SEP 1 2 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. — MIAMI

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 1956(h)
18 U.S.C. § 1956(a)(1)(B)(i)
18 U.S.C. § 1957(a)
18 U.S.C. § 2
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1), (a)(7)

**UNITED STATES OF AMERICA**

**v.**

**PETER PORT,**
**BRIAN DUBLYNN, and**
**JENNIFER SANFORD,**

      **Defendants.**

_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### Federal Guidelines for Substance Abuse Treatment

1.     The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA") was tasked with establishing and implementing a comprehensive program to improve the provision of treatment and related services to individuals with respect to substance abuse and with protecting the legal rights of individuals who were substance abusers. 42 U.S.C. § 290aa.

2.      "Substance abuse" was defined as "the abuse of alcohol or other drugs." 42 U.S.C. § 290cc-34(4). "Treatment" meant "the management and care of a patient suffering from alcohol or drug abuse, a condition which is identified as having been caused by that abuse, or both, in order to reduce or eliminate the adverse effects upon the patient." 42 C.F.R. § 2.11.

3.      In addition to substance abuse treatment programs, SAMHSA promulgated guidelines for "sober homes." Sober homes were living facilities where clients lived together in a drug-free and alcohol-free environment while working to maintain sobriety. Sober homes generally did not provide medical care or clinical services to their residents; such services were provided at a substance abuse treatment center. Clients at sober homes were expected to pay their own rent and utilities, allowing the sober homes to recover their costs. When properly managed, sober homes operated as alcohol and drug free residential environments for individuals attempting to abstain from alcohol and drugs.

4.      Substance abuse treatment centers provided services, such as individual or group therapy sessions, to assist clients in overcoming their addictions. There were varying levels of treatment provided, including detoxification ("Detox"), Partial Hospitalization Programs ("PHP"), Intensive Outpatient Programs ("IOP"), and Outpatient Programs ("OP"). Detox, PHP, IOP, and OP treatment could be billed to health care benefit programs when they were medically necessary and provided by, or overseen by, licensed medical professionals.

### Substance Abuse Treatment in Florida

5.      Substance abuse services in Florida were governed by the "Hal S. Marchman Alcohol and Other Drug Services Act" ("the Marchman Act"), Fla. Stat § 397.301. Under the Marchman Act, private substance abuse service providers' policies regarding payment for services had to comply with federal and state law. Fla. Stat § 397.431.

2

6.     All "clinical treatment'" under the Marchman Act, including Detox, PHP, IOP, and OP needed to be "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle." Fla. Stat § 397.311(26)(a).

7.     Furthermore, the Marchman Act made it unlawful for any person or agency to act as a substance abuse service provider unless properly licensed.  Fla. Stat §  397.401(1); Fl. Admin. Code §  65D-30.003(1)(a).

8.     The Florida Department of Children and Families ("DCF") was tasked with regulating and licensing substance abuse providers. Fla. Stat §  397.321.

9.     The Florida Department of State promulgated rules for substance abuse treatment services, including standards for Detox, PHP, IOP and OP. Fla. Admin. Code §§ 65D-30.006, 65D-30.0081, 65D-30.0091 and 65D-30.010.

## American Society of Addiction Medicine

10.     The American Society of Addiction Medicine ("ASAM") is a professional medical society representing over 6,000 physicians, clinicians and associated professionals in the field of addiction medicine.  ASAM published the ASAM Criteria, which was a collection of objective guidelines that give clinicians a way to standardize treatment planning and where patients are placed in treatment, as well as how to provide continuing, integrated care and ongoing service planning, including for Detox, PHP, IOP, and OP treatment services.

## Payment for Substance Abuse Treatment

11.     Insurance coverage for substance abuse treatment and testing was available through a number of avenues, including federal health care benefits programs like the Federal Employees Health Benefits Program ("FEHBP"), health plans sponsored by employers, and health plans

3

offered directly by private insurance companies. Health plans sponsored by private employers were governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et. seq., while those sponsored by government employers and certain others are exempted from ERISA's jurisdiction.

12.     Both ERISA and non-ERISA health benefit plans, including Affordable Care Act plans, were offered or administered by private insurance companies.

13.     Aetna Health Management LLC and Aetna Life Insurance for Members ("Aetna"); Blue Cross/Blue Shield ("BCBS"); Cigna Healthcare ("Cigna"); Humana Inc. ("Humana"); United Behavioral Health and United Health Group, Inc. ("United"); and Optum Health ("Oputm") were health insurance providers doing business in the State of Florida.

14.     The health insurance providers described above in paragraph 13 (collectively referred to hereinafter as "the Insurance Plans") were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

15.     Under the terms of insurance policies and consistent with state and federal law, the Insurance Plans were only responsible for claims for services that: (a) were medically necessary and actually rendered, (b) were provided by a properly licensed service provider, and (c) complied with the terms of the health care plans, including the obligation to pay co-insurance and deductibles.

## Payment for Residing at Sober Homes

16.     Unlike substance abuse treatment centers, sober homes generally did not provide medical care or clinical services that could be reimbursed by health insurance. While there were federal and state guidelines, sober homes were not licensed or funded by state or local

4

governments. Since sober homes were ostensibly places to live, legitimate sober homes generated income through the collection of weekly or monthly rent paid by their residents, just as with any landlord-tenant relationship.

**Bodily Fluid Testing**

17.     Bodily fluid testing could be used to detect recent drug or alcohol use by conducting various tests on an individual's urine, blood, and saliva.

18.     To aid in the processing and adjudication of claims, health care benefit programs used standardized codes to describe individuals' diagnoses, tests, treatments, and procedures for which health care providers sought payment and reimbursement. The procedural codes used by substance abuse treatment centers and clinical laboratories to bill health care benefits programs for these items included:

| CPT CODE – Current Procedural Terminology Code | Procedural Code Description |
|---|---|
| H0014 | Alcohol and/or drug services; Ambulatory detoxification |
| S9475 | Ambulatory setting substance abuse treatment or detoxification services, per diem |
| H0015 | IOP – Intensive Outpatient Program Drug and Alcohol |
| H0035 | PHP – Partial Hospitalization Program Drug and Alcohol |
| H0048 | Drug and Alcohol Testing |
| 80101 | Drug Screen – Qualitative; Single Drug Class Method |
| 80152 | Drug Test – Amitripylineam |
| 80160 | Drug Test – Desipramine |
| 80166 | Drug Test – Doxepin |
| 80174 | Drug Test – Imipramine |
| 80182 | Drug Test – Nortriptyline |
| 82055 | Alcohol Testing – No Breath |
| 82542 | Mass Spectrometry – Column  Chromatography |
| 82646 | Drug Test – Dihydrocodeinone |
| 82649 | Drug Test – Dihydromorphinone |
| 83925 | Drug Test – Opiates |
| 90853 | Group Psychotherapy |
| G0480 | Definitive Drug Testing – 1-7 drug class(es), including metabolites |
| G0481 | Definitive Drug Testing – 8-14 drug class(es), including metabolites |

| CPT CODE – Current Procedural Terminology Code | Procedural Code Description |
|---|---|
| G0482 | Definitive Drug Testing – 15-21 drug class(es), including metabolites |
| G0483 | Definitive Drug Testing – 22 or more drug class(es), including metabolites |

19.    Like other medical tests, bodily fluid testing could be billed and reimbursed pursuant to the terms of the insurance policy. The Insurance Plans were only responsible for claims for testing that were "medically necessary," actually performed, prescribed, and conducted by a properly licensed service provider, and conducted and billed in compliance with the terms of the health care plan, including the obligation to pay co-insurance.

20.    Urine drug testing ranged in complexity from screening tests-also known as point of care ("POC") testing-which provided instant results and was relatively simple and inexpensive, to definitive or confirmatory testing, which was sent to a laboratory for more complex analysis and was substantially more expensive. Laboratories could also conduct complex analysis on blood and saliva samples.

21.    Point of Care ("POC") urine testing involved collecting a client's urine in a specific cup designed for testing. The specimen utilized a color banded or numbered dipstick, allowing for positive or negative visual results. POC urine testing usually tested for the presence of nine to thirteen specific types of drugs. POC tests typically cost between $5 and $10 and could be easily read by a layperson. This testing was convenient, less costly, and the results could be read quickly. POC testing was the most common form of testing performed at sober homes and treatment facilities.

22.    Definitive or confirmatory urine drug tests ("DUDTs"), conducted in a laboratory setting, made use of gas liquid chromatography, mass spectrometry, and/or gas chromatography, or high performance liquid chromatography, to analyze the individual's urine specimen. These

techniques were highly sensitive, and accurately and definitively identified specific substances and the quantitative concentrations of the drugs or their metabolites. DUDTs were more precise, more sensitive, and detected more substances than other types of urine testing. Results of confirmatory testing took longer and were significantly more expensive.

## The Defendants and Related Individuals and Entities

### The Treatment Center

23.     Safe Haven Recovery, Inc. ("Safe Haven") was a Florida corporation with its principal place of business in Miami-Dade County. Safe Haven purported to operate as a licensed "substance abuse service provider" or "substance abuse treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction.

### The Laboratories

24.     Lab #1 was a Florida limited liability company with its principal place of business in Broward County. Lab #1 performed urine drug testing for Safe Haven.

25.     Lab #2 was a Florida corporation with its principal place of business in Miami-Dade County. Lab #2 performed urine drug testing for Safe Haven.

26.     Lab #3 was a Florida corporation with its principal place of business in Broward County. Lab #3 performed urine drug testing for Safe Haven.

27.     Lab #4 was a California corporation with its principal place of business in Los Angeles County, California. Lab #4 performed urine drug testing for Safe Haven.

28.     Lab #5 was a Pennsylvania corporation with its principal place of business in Bucks County, Pennsylvania. Lab #5 performed urine drug testing for Safe Haven.

29.     Lab #6 was a Florida limited liability company with its principal place of business in St. Lucie County. Lab #6 performed urine drug testing for Safe Haven.

30. Lab #7 was a Florida limited liability company with its principal place of business in Broward County. Lab #7 performed urine drug testing for Safe Haven.

31. Lab #8 was a Georgia corporation with its principal place of business in Lumpkin County, Georgia. Lab #8 performed urine drug testing for Safe Haven.

## Other Entities

32. Kiawah Properties Corp. ("Kiawah Properties") was a Florida limited liability company with its principal place of business in Miami-Dade County.

33. Troon Consulting Inc. ("Troon Consulting") was a Florida corporation with its principal place of business in Palm Beach County.

34. Interactive Abstract Corp. ("Interactive Abstract") was a New York corporation with its principal place of business in Nassau County, New York.

35. Dubs Enterprise LLC ("Dubs Enterprise") was a Florida limited liability company with its principal place of business in Palm Beach County.

36. UA Drop Corp. ("UA Drop") was a New York corporation with its principal place of business in Queens County, New York.

37. Corporation 1 was a Florida corporation with its principal place of business in Broward County.

38. Holding Company 1 was a Florida limited liability company with its principal place of business in Broward County.

39. Holding Company 2 was a Florida limited liability company with its principal place of business in Broward County.

40. LLC 1 was a Florida limited liability company with its principal place of business in Hillsborough County, Florida.

8

## The Defendants and Relevant Individuals

41.     **PETER PORT**, a resident of Palm Beach County, Florida, founded, owned and controlled Safe Haven, and owned and/or controlled Kiawah Properties, Troon Consulting, and Interactive Abstract.

42.     **BRIAN DUBLYNN**, a resident of Broward County, Florida, was a registered Vice President of Safe Haven, operated and controlled Safe Haven, and owned and controlled Dubs Enterprise.

43.     **JENNIFER SANFORD**, a resident of Broward County, Florida, purported to work as a marketer for Safe Haven.

44.     Physician 1, a resident of Miami-Dade County, was a physician licensed in the State of Florida and served as a medical director of Safe Haven.

45.     Individual 1, a resident of Broward County, Florida, purported to work as a marketer for clinical laboratories, including Lab #3, and owned and controlled Corporation 1.

46.     Individual 2, a resident of Broward County, Florida, owned and controlled Holding Company 1, Holding Company 2, Lab #3 and Lab #8.

47.     Individual 3, a resident of Miami-Dade County, Florida, owned and controlled Lab #2.

## COUNT 1
## Conspiracy to Commit Health Care Fraud and Wire Fraud
## (18 U.S.C. § 1349)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around July 2014, and continuing through the return of this Indictment, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**PETER PORT,**
**BRIAN DUBLYNN, and**
**JENNIFER SANFORD,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other, and others, known and unknown to the Grand Jury, to commit offenses against the United States, that is:

        a.    to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, the Insurance Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs affecting commerce, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

        b.    to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## **Purpose of the Conspiracy**

        3.    It was a purpose of the conspiracy for the defendants and their co-conspirators to unjustly enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to the Insurance Plans; (b) concealing the submission of false and

fraudulent claims to the Insurance Plans, and the receipt and transfer of fraud proceeds; and (c) diverting the fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4. **PETER PORT, BRIAN DUBLYNN** and co-conspirators established, operated and controlled Safe Haven, a substance abuse treatment center, which was purportedly in the business of providing clinical treatment services for persons suffering from alcohol and drug addiction.

5. **PETER PORT, BRIAN DUBLYNN** and co-conspirators created and signed documents to conceal from the Florida Department of Children and Families, and others, the fact that **PORT** owned and controlled Safe Haven.

6. **PETER PORT, BRIAN DUBLYNN** and co-conspirators purported to provide drug-free and alcohol-free residences, known as sober homes, in which substance abuse patients would reside during their admission at Safe Haven.

7. To obtain patients for Safe Haven, **PETER PORT, BRIAN DUBLYNN, JENNIFER SANFORD** and co-conspirators paid, and caused to be paid, kickbacks and bribes in the form of cash, free or reduced sober homes rent, payment for food, payment for travel (including airfare), and other benefits to individuals with insurance who agreed to be patients at Safe Haven and attend substance abuse treatment, often in the form of Detox, PHP, IOP and/or OP sessions, and to submit to excessive (typically three or more times per week) and medically unnecessary urine drug testing, including DUDTs, so members of the conspiracy could bill the patients'

Insurance Plans for substance abuse treatment and urine drug testing, including DUDTs, without regard to medical necessity.

8.    **PETER PORT**, **BRIAN DUBLYNN** and co-conspirators paid, and caused to be paid, kickbacks and bribes to patient recruiters, including **JENNIFER SANFORD**, for referring individuals to serve as patients at Safe Haven.

9.    **PETER PORT**, **BRIAN DUBLYNN** and co-conspirators permitted patients admitted at Safe Haven to use illicit drugs in Safe Haven's sober homes to induce patients to stay at Safe Haven and to agree to receive substance abuse treatment services and submit to excessive urine drug testing, including DUDTs.

10.    **PETER PORT**, **BRIAN DUBLYNN**, **JENNIFER SANFORD** and co-conspirators caused Safe Haven to submit claims to the Insurance Plans for addiction treatment services, including Detox, PHP, IOP and OP, that were not provided as billed in that, among other things, Safe Haven failed to provide required individualized addiction treatment to patients, failed to provide required medical oversight, allowed patients to miss some or all of certain required therapy sessions, provided therapy by unlicensed professionals that did not qualify as actual addiction treatment, failed to timely review initial psychiatric evaluations, did not form individual treatment plans and meet with patients to discuss patient care, and undercut the very purpose of its addiction treatment services by permitting patients at Safe Haven to use illicit drugs, including marijuana, cocaine, and opiates, while admitted at Safe Haven.

11.    **PETER PORT**, **BRIAN DUBLYNN**, **JENNIFER SANFORD**, Individual 1, Physician 1 and co-conspirators ordered and caused the ordering of excessive, medically unnecessary urine drug tests, including DUDTs, for Safe Haven patients on a systematic basis from

12

clinical laboratories, including Lab #1, Lab #2, Lab #3, Lab #4, Lab #5, Lab #6, Lab #7, and Lab #8, and failed to use the results of these tests to determine treatment of Safe Haven patients.

12.     **PETER PORT, BRIAN DUBLYNN, JENNIFER SANFORD,** Individual 1, Physician 1 and co-conspirators ordered and caused the ordering of urine drug screens and expensive definitive or confirmatory urine drug testing that were not medically necessary or reimbursable by the Insurance Plans, in that, among other things:  (i) the urine drug tests were ordered on a systematic basis and not on an individualized basis according to the medical need of the patient; (ii) the urine drug tests were ordered too frequently (i.e., every other day) to allow for meaningful use of the tests in medical decision-making, as additional tests were often ordered before any medical professional or doctor received or reviewed the results of the previous tests; (iii) the urine drug tests were not timely reviewed by a qualified medical professional or by a doctor or treatment professional in developing or modifying the patients' treatment; (iv) many of the urine drug tests were not reviewed by a qualified medical professional or by a doctor or treatment professional until days or weeks after the results were reported, at which point the patient often had been discharged from Safe Haven, and some urine drug tests were not reviewed at all; and (v) when a patient tested positive for a substance that he or she should not have been taking, Safe Haven seldom took action or imposed consequences for patients with medical insurance.

13.     **PETER PORT, BRIAN DUBLYNN, JENNIFER SANFORD,** Individual 1 and co-conspirators directly and indirectly solicited and received kickbacks and bribes from co-conspirator clinical laboratory owners, agents and employees, including Individual 2 and Individual 3, for sending the orders for expensive urine drug tests, including definitive or confirmatory tests, for patients of Safe Haven to the clinical laboratories that, in turn, would bill the patients' Insurance Plans.  These kickbacks and bribes were sometimes paid through shell

companies, including Holding Company 1, Holding Company 2, Corporation 1, LLC 1 and UA Drop.

14.     **PETER PORT**, **BRIAN DUBLYNN** and other co-conspirators hired Physician 1 to serve as medical director of Safe Haven. **PORT** and **DUBLYNN** paid and caused the payment of Physician 1's monthly salary, and in return, Physician 1 ordered drug screens and expensive definitive or confirmatory urine drug testing for Safe Haven's patients, regardless of whether such testing was medically necessary or conducted, and billed in compliance with the terms of the patients' Insurance Plans.

15.     **PETER PORT**, **BRIAN DUBLYNN** and co-conspirators directly and indirectly. maintained control over patients at Safe Haven by threatening to confiscate and confiscating the patients' personal belongings, including, money, identification and medications, and permitted patients to use drugs while admitted at Safe Haven, among other things, in order to keep patients at Safe Haven so that Safe Haven could continue to bill the Insurance Plans.

16.     **PETER PORT**, **BRIAN DUBLYNN**, **JENNIFER SANFORD**, Individual 1, Individual 2, Individual 3, Physician 1 and co-conspirators submitted and caused the submission of false and fraudulent insurance claims to the Insurance Plans, via interstate wire communication, for various health care benefits, primarily substance abuse treatment and bodily fluid testing, including urine drug testing, that were medically unnecessary, not provided, obtained through kickbacks and bribes, and otherwise not eligible for reimbursement.

17.     As a result of such false and fraudulent claims, Safe Haven and Lab #1, Lab #2, Lab #3, Lab #4, Lab #5, Lab #6, Lab #7, and Lab #8 received payments from the Insurance Plans.

14

18.   **PETER PORT**, **BRIAN DUBLYNN**, **JENNIFER SANFORD**, Individual 1,

Physician 1 and co-conspirators used the proceeds from the false and fraudulent claims for their

own use and the use of others, and to further the fraud.

All in violation of Title 18, United Stated Code, Section 1349.

## COUNTS 2-5
## Health Care Fraud
## (18 U.S.C. § 1347)

1.   The General Allegations section of this Indictment is re-alleged and incorporated

by reference as though fully set forth herein.

2.   From in or around July 2014, and continuing through the return of this indictment,

in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**PETER PORT,**
**BRIAN DUBLYNN, and**
**JENNIFER SANFORD,**

in connection with the delivery of and payment for health care benefits, items, and services, did

knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health

care benefit program affecting commerce, as defined in Title 18, United States Code, Section

24(b), that is, the Insurance Plans, and to obtain, by means of materially false and fraudulent

pretenses, representations, and promises, money and property owned by, and under the custody

and control of, said health care benefit programs.

### Purpose of the Scheme and Artifice

3.   It was a purpose of the scheme and artifice for the defendants and their accomplices

to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission

of false and fraudulent claims to the Insurance Plans; (b) concealing the submission of false and

fraudulent claims to the Insurance Plans, and the receipt and transfer of fraud proceeds; and (c)

15

diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## The Scheme and Artifice

4. The allegations contained in the Manner and Means of the Conspiracy section of Count 1 are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## Acts in Execution or Attempted Execution of the Scheme and Artifice

5. On or about the dates set forth below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants, **PETER PORT, BRIAN DUBLYNN AND JENNIFER SANFORD**, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, the Insurance Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in that the defendants submitted and caused the submission of false and fraudulent claims seeking the identified dollar amounts, representing that the services listed below were medically necessary:

| Count | Approx. Claim Submission Date | Patient | Approx. Claim Amount | Benefit Provider/ Claim No. | Description of Claim |
|-------|-------------------------------|---------|----------------------|-----------------------------|----------------------|
| 2 | 10/06/2016 | G.S. | $4,000 | BC/BS Claim No. H100000559776703 | Drug Test Definitive 1-7 Classes (G0480) |
| 3 | 10/07/2016 | M.G. | $4,000 | BC/BS Claim No. H100000559975583 | Drug Test Definitive 1-7 Classes (G0480) |

16

| Count | Approx. Claim Submission Date | Patient | Approx. Claim Amount | Benefit Provider/ Claim No. | Description of Claim |
|-------|-------------------------------|---------|----------------------|-----------------------------|----------------------|
| 4 | 10/24/2016 | C.S. | $4,000 | BC/BS Claim No. H100000562690106 | Drug Test Definitive 1-7 Classes (G0480) |
| 5 | 08/04/2017 | K.M. | $3,404 | Aetna Claim No. RVH9165 | Drug Test Definitive 22+ Classes (G0483) |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 6
### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

From in and around July 2014, through in or around July 2019, in Miami-Dade County, in

the Southern District of Florida, and elsewhere, the defendants,

### PETER PORT
### and
### BRIAN DUBLYNN,

did willfully, that is, with intent to further the object of the conspiracy, and knowingly combine,

conspire, confederate, and agree with each other and with others, known and unknown to the Grand

Jury, to violate Title 18, United States Code, Section 1956(a)(l)(B)(i), that is, to knowingly conduct

a financial transaction affecting interstate and foreign commerce involving the proceeds of

specified unlawful activity, knowing that the property involved in such financial transaction

represented the proceeds of some form of unlawful activity, and knowing that such financial

transaction was designed in whole and in part to conceal and disguise the nature, location, source,

ownership, and control of the proceeds of specified unlawful activity.

It is further alleged that the specified unlawful activity is wire fraud, health care fraud, and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Sections 1343, 1347 and 1349.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 7-14
### Money Laundering
### (18 U.S.C. § 1956(a)(1)(B)(i))

On or about the dates specified as to each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant so identified in each count did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that such transaction was designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, as more specifically described below:

| Count | Defendant | Approximate Date | Description of Financial Transaction |
|-------|-----------|------------------|--------------------------------------|
| 7 | **BRIAN DUBLYNN** | 01/16/2016 | **BRIAN DUBLYNN** negotiated UA Drop Corp. Check No. 1502 in the amount of $7,500, using an account ending in 4588 at TD Bank, made payable to **BRIAN DUBLYNN** |
| 8 | **PETER PORT** | 08/08/2017 | **PETER PORT** negotiated Safe Haven Check No. 8967 in the amount of $20,000, using an account ending in 8363 at Bank of America, made payable to Kiawah Properties Corp. |
| 9 | **BRIAN DUBLYNN** | 12/17/2017 | **BRIAN DUBLYNN** negotiated UA Drop Corp. Check No. 0098 in the amount of $21,000, using an account ending in 4588 at TD Bank, made payable to **BRIAN DUBLYNN** |

| Count | Defendant | Approximate Date | Description of Financial Transaction |
|-------|-----------|------------------|--------------------------------------|
| 10 | **BRIAN DUBLYNN** | 01/26/2018 | **BRIAN DUBLYNN** negotiated UA Drop Corp. Check No. 1503 in the amount of $9,000, using an account ending in 4588 at TD Bank, made payable to **BRIAN DUBLYNN** |
| 11 | **BRIAN DUBLYNN** | 01/27/2018 | **BRIAN DUBLYNN** negotiated UA Drop Corp. Check No. 1504 in the amount of $6,000, using an account ending in 4588 at TD Bank, made payable to **BRIAN DUBLYNN** |
| 12 | **BRIAN DUBLYNN** | 02/08/2018 | **BRIAN DUBLYNN** negotiated Safe Haven Check No. 2917 for $4,000 using an account ending in 8054 at Bank of America made payable to Dubs Enterprise LLC |
| 13 | **PETER PORT** | 02/26/2018 | **PETER PORT** negotiated Safe Haven Check No. 9195 in the amount of $50,000, using an account ending in 8363 at Bank of America, made payable to Troon Consulting |
| 14 | **PETER PORT** | 12/07/2018 | **PETER PORT** negotiated Safe Haven Check No. 10080 in the amount of $20,000, using an account ending in 8363 at Bank of America, made payable to Interactive Abstract |

It is further alleged that the specified unlawful activity is wire fraud, health care fraud, and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Sections 1343, 1347 and 1349.

In violation of Title 18, United States, Sections 1956(a)(1)(B)(i) and 2.

<u>**COUNTS 15-16**</u>
**Money Laundering**
**(18 U.S.C. § 1957(a))**

On or about the dates specified as to each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**PETER PORT,**

did knowingly engage and attempt to engage in a monetary transaction by, through, and to a

financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000, and such property having been derived from specified unlawful activity, knowing that the property involved in the monetary transaction was derived from some form of unlawful activity, as set forth below:

| Count | Approximate Date | Description of Monetary Transaction |
|-------|------------------|-------------------------------------|
| 15 | 06/26/2018 | PETER PORT negotiated Safe Haven Check No. 9488 in the amount of $50,000, using an account ending in 8363 at Bank of America, made payable to Interactive Abstract. |
| 16 | 03/26/2019 | PETER PORT negotiated Safe Haven Check No. 9965 in the amount of $200,000, using an account ending in 8363 at Bank of America, made payable to Troon Consulting. |

It is further alleged that the specified unlawful activity is wire fraud, health care fraud, and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Sections 1343, 1347 and 1349

In violation of Title 18, United States Code, Sections 1957(a) and 2.

### FORFEITURE
### (18 U.S.C. § 981(a)(1)(C))
### (18 U.S.C. § 982(a)(1) and (a)(7))

1.      The allegations of this Indictment are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which any of the defendants, **PETER PORT, BRIAN DUBLYNN,** and **JENNIFER SANFORD,** have an interest.

2.      Upon conviction of a violation of Title 18, United States Code, Sections 1347 or 1349, as alleged in this Indictment, the defendant so convicted shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3.      Upon conviction of a violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i), 1956(h) or 1957(a), as alleged in this Indictment, the defendant so convicted shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

4.      The property subject to forfeiture as a result of the alleged offenses includes, but is not limited to, the following:

(i)     a sum of at least $13,657,173.41, which represents the total amount of gross proceeds obtained as a result of violations of Title 18, United States Code, Sections 1347 and 1349, as alleged in the Indictment, which may be sought as a forfeiture money judgment;

(ii)    real property located at 50 Starling Court, Roslyn, New York 11576;

(iii)   real property located at 3579 NW Clubside Circle, Boca Raton, Florida 33496;

(iv)    real property located at 1417 NE 17th Street, Ft. Lauderdale , Florida 33305;

(v)     A 2016 Mercedes Model E400C4, bearing Vehicle Identification Number WDDKJ6HB9GF317576;

(vi)    The contents of account number 483049118363 at Bank of America held in the name of Safe Haven Recovery, Inc.;

(vii)   The contents of account number 483072846301 at Bank of America held in the name of Safe Haven Recovery, Inc.;

(viii)  The contents of account number 483049118305 at Bank of America held in the name of Kiawah Properties Corp.;

(ix)    The contents of account number 4835570293 at Bank of America held in

21

the name of Interactive Abstract Corp.;

(x)    The contents of account number 4835570303 at Bank of America held in the name of Interactive Abstract Corp.;

(xi)   The contents of account number 898086389630 at Bank of America held in the name of Troon Consulting, Inc.;

(xii)  The contents of account number 483068437818 at Bank of America held in the name of Excel One Municipal Corp.; and

(xiii) The contents of account number 898095180930 at Bank of America held in the name of First Rate Medical Billing Corp.;

5.    If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty.

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), 982(a)(7),

Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

ALLAN MEDINA
ACTING DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

DAVID A. SNIDER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | CASE NO. _____ |
|---|---|

v.

Peter Port,
Brian Dublynn and
Jennifer Sanford,      ⊞
           Defendants. ⌐

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division:** (Select One)
  ✓   Miami   ___   Key West
  ___   FTL   ___   WPB   ___   FTP

New defendant(s)      Yes ____    No ____
Number of new defendants ____
Total number of counts ____

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No)    No
    List language and/or dialect   _____

4. This case will take  10-15  days for the parties to try.

5. Please check appropriate category and type of offense listed below:

(Check only one)

| | | | (Check only one) | |
|---|---|---|---|---|
| I | 0 to 5 days | _____ | Petty | _____ |
| II | 6 to 10 days | _____ | Minor | _____ |
| III | 11 to 20 days | ✓ | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | ✓ |
| V | 61 days and over | _____ | | |

6. Has this case previously been filed in this District Court?   (Yes or No)    No ____
   If yes: Judge                 Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?   (Yes or No)    No ____
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____

   Is this a potential death penalty case? (Yes or No)     No ____

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)?       Yes ____      No ✓

8. Does this case originate from a matter pending in the Northern Region U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?       Yes ____      No ✓

_____
DAVID SNIDER
DOJ TRIAL ATTORNEY
COURT NO. A5502260

*Penalty Sheet(s) attached                                    REV 8/13/2018

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** **PETER PORT**

**Case No:** _____

Count #: 1

Title 18, United States Code, Section 1349

Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty:** Twenty (20) years' imprisonment

Counts #: 2 - 5

Title 18, United States Code, Section 1347

Health Care Fraud

**\*Max Penalty:** Ten (10) years' imprisonment as to each count

Count #: 6

Title 18, United States Code, Section 1956(h)

Conspiracy to Commit Money Laundering

\*Max Penalty: Twenty (20) years' imprisonment

Counts #: 8, 13, 14

Title 18, United States Code, Section 1956(a)(1)(B)(i)

Money Laundering

\*Max Penalty: Twenty (20) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** _____ **PETER PORT**_____

**Case No:** _____

Counts #:  15 – 16

_ Title 18, United States Code, Section 1957(a)_____

_ Money Laundering_____

**\*Max Penalty**:  Ten (10) years' imprisonment as to each count_____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** _____ **BRIAN DUBLYNN** _____

**Case No:** _____

Count #: 1

Title 18, United States Code, Section 1349 _____

Conspiracy to Commit Health Care Fraud and Wire Fraud _____

**\*Max Penalty**: Twenty (20) years' imprisonment _____

Counts #: 2 - 5

Title 18, United States Code, Section 1347 _____

Health Care Fraud _____

**\*Max Penalty**: Ten (10) years' imprisonment as to each count _____

Count #: 6

Title 18, United States Code, Section 1956(h) _____

Conspiracy to Commit Money Laundering _____

\*Max Penalty: Twenty (20) years' imprisonment _____

Counts #: 7, 9, 10, 11, 12

Title 18, United States Code, Section 1956(a)(1)(B)(i) _____

Money Laundering _____

\*Max Penalty: Twenty (20) years' imprisonment as to each count _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**          **JENNIFER SANFORD**

**Case No:**

Count #:   1

   Title 18, United States Code, Section 1349

   Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty:**   Twenty (20) years' imprisonment

Counts #:   2 – 5

   Title 18, United States Code, Section 1347

   Health Care Fraud

**\*Max Penalty:**   Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**